We'll hear argument now in the case of Bio v. Inventiv Health. Mr. Stowers. Good morning, Your Honors. May it please the Court, Maman Bio, the appellant in this case, is a black man from Niger, Africa. He brought his lawsuit in the district court because he believed he was discriminated because of his race and national origin. We believe we have presented sufficient facts to survive summary judgment under the McDonnell-Douglas paradigm. We believe there is only really two issues in this case. The appellees in this case have conceded that Mr. Bio has proven the first three elements of the prima facie case. So the only issue that remains is whether Mr. Bio has proven the fourth element of the prima facie case and whether the reason given for his termination is pretext. Now regarding the fourth element of the prima facie case, the first question we have to answer is what variation of the prima facie case we must apply in this case because in many reduction in force cases, the fourth element of the prima facie case is different. The typical standard is the similarly situated standard, but in a mini reduction in force, the standard is whether or not the plaintiffs in job duties have been absorbed by individuals outside of his protected class. And gentlemen, I will assert that this is a mini reduction in force case. Mr. Bio's job duties were in fact absorbed by individuals outside of his protected classes. They were absorbed by two individuals, Asha Basile, who is a white employee from a different country than Mr. Bio, and Steve Benjamin, who is a white employee from a different country than Mr. Bio. Asha Basile was a manager in the statistical programming group, and Steve Benjamin was the associate director of the statistical programming group. Immediately prior to Mr. Bio's termination, he also was a manager in the statistical programming group, and he had 10 programmers that worked under his authority. Immediately after Mr. Bio's termination, those 10 programmers were immediately transferred to Asha Basile and Steve Benjamin. Eight of them were transferred to Asha Basile, and two of them were transferred to Steve Benjamin. Now, one of those employees that had worked for Mr. Bio has testified that after Mr. Bio was terminated and he was transferred to Asha Basile, that she performed the exact same functions as Mr. Bio prior to Mr. Bio's termination. He also testified that he was still working on the exact same projects that he was working on prior to Mr. Bio's termination when he started working for Asha Basile. Also, in regards to Asha Basile, as of the date of Mr. Bio's termination, Asha Basile literally had no work. She had completed the only project that she had been working on, which was a Lilly project, Eli Lilly, I think three days before Mr. Bio was terminated, and she was concerned about what she was going to do next. She had, in fact, had a conversation with Mr. Bio wondering what she was going to do next. Unfortunately for Mr. Bio, the appellees, in this case Inventive, decided to transfer the bulk of Mr. Bio's employees over to Asha Basile and also his job duties, and then they terminated Mr. Bio. I think you mean they terminated his employment. They did not terminate him. They did not terminate him. They terminated his employment, Your Honor. Also, now, in regards to Steve Benjamin, he also, two of Mr. Bio's employees were transferred over to Steve Benjamin, and they also were doing the exact same work they were doing when they worked under Mr. Bio. They were doing analytical software testing, and that's exactly what they were doing when they worked under Mr. Bio. Also, in regards to Steve Benjamin, Mr. Bio, prior to his termination, consulted with another associate director for the Inventive's Phase 2 and 3 project. When she needed assistance with projects that her group no longer had capacity to do, she would contact Mr. Bio, and he would take on those projects. After Mr. Bio was terminated, then Steve Benjamin communicated with Nancy Fish. Bottom line, ladies and gentlemen, I'm sorry, gentlemen, what this evidence shows is that Mr. Bio's job duties were transferred over to employees outside of his protected class, so we believe that we have presented sufficient evidence to prove a pre-manifestation case. We also note that the district court also concluded that we have presented sufficient evidence to prove a pre-manifestation case. The second issue, whether the reason given for Mr. Bio's termination of his employment is pretext. Now, the reason that was given for Mr. Bio, in order to prove pretext, we must show that the reason given was a phony reason, not the real reason, or just an outright lie. Now, the reason given for Mr. Bio's termination was that, termination of his employment, was that Lilly, a client or a customer of Inventive, no longer had any work of the kind that Mr. Bio was designated to do. Now, that's simply not true. At the time of Mr. Bio's termination, he was still doing Lilly projects, and in fact, he was scheduled to start working on additional Lilly projects July 15th of 2015, which turned out to be two weeks after his termination. So, the reason given for Mr. Bio's termination could not be true, because he was still working on Lilly projects, and more Lilly projects was coming on board, which he was scheduled to work. Also, in regards to pretext, if the real reason for Mr. Bio's termination was not Lilly work, then Asha Basile would have been terminated, because she had literally no work. The only Lilly project that she was working on had been completed two or three days before Mr. Bio's termination, but Asha Basile was not terminated. She was retained and basically took over Mr. Bio's position. So, the bottom line, gentlemen, we believe that this evidence taken as a whole will show that the reason given for Mr. Bio's termination is pretext, and we believe that this evidence also will show that there are genuine issues of material fact regarding Mr. Bio's termination, and we'd ask the court to reverse the district court's judgment and to remand this case to the district court for trial. We reserve the remainder of our time for rebuttal. Mr. McLaughlin. Thank you, Your Honor. May it please the court, Alan McLaughlin on behalf of defendant appellant, Inventive Health Clinical, LLC. Appellant cites absolutely no record evidence to support claims that Inventive had any discriminatory animus toward him because he was black or from Niger. Mr. Bio has not identified and cannot identify any similarly situated employees who received better treatment because no such employee exists. While Mr. Bio makes numerous claims and arguments about other work that his team may have, could have done, or began doing after the loss of the specific work for which they were formed, or perhaps should have been allowed to do, there is no record evidence to dispute the fact that the heads-down programming work for Lilly for which his team was established, in fact, went away. And indeed, no one else assumed that work. And counsel gets a bit fast and loose about referring to Lilly work. And the district court did a good job of clarifying what we're talking about. He can debate whether we should have been organized the way we were. He can debate whether there was a better business way to organize the teams than the way they were organized. But there is no record evidence to dispute the fact that Mr. Bio's team was organized to deal specifically and exclusively with that heads-down programming work based on a specific contract for Lilly. Lilly determined to… What is heads-down programming? It is numbers crunching. A fair question, Your Honor. Yes. Using phrases that are likely to be familiar to generalists really helps understanding. And I apologize, Your Honor. The most generic way to describe this is that there were teams like Aisha Basile's that worked directly with Lilly. And they worked to plan the studies, to design the studies, to set a timeline for those studies. Once that was done, the work was then assigned to Mr. Bio's team to crunch the numbers, to do the basic analysis. When they were done with that analysis, they returned that work to Aisha Basile's team, and it went back to Lilly. It is undisputed in this record that Lilly at some point said in late 2014 and throughout early 2015, we can do this work ourselves, and we are no longer going to give this work to inventive, and therefore that work went away. Which brings us to the point that Mr. Bio then, whether you view it as favorable for him or unfavorable, started freelancing and going to get other work from other managers that was different than the work his team was formed to do. And he kept his team busy doing that. While we respectfully disagree with the district court's conclusion, I should back up, inasmuch as he cannot show any discriminatory animus and he cannot identify similar situated employees, as counsel indicated, he then turns to seek the protection of the mini-RIF analysis. And while we respectfully disagree with the court's conclusion that the mini-RIF analysis applies, it is of no consequence, because the court ultimately found, and I quote, Bio's position as a manager and the work of the team he managed was dedicated to specific work governed by a contract with Lilly. That specific work eventually concluded. Bio's arguments and evidence do not dispute these facts. It appears that Bio simply hoped that by keeping his team members busy on other managers' projects, that he would be able to retain his job as a manager. That is the most clear and succinct statement of this case. The work went away. It no longer existed. Mr. Bio hoped that he could find other work to keep his team members busy, and he did. But that was not how Inventive organized its teams, and it found positions for those others. Perhaps even more problematic for Mr. Bio is the obvious and unchallenged diversity of his team of programmers. Of those ten programmers he identified, there was Akaya Data, who was from the Islamic Republic of Mauritania. What conceivable relevance does this have? Your Honor, to the extent that The Supreme Court has rejected a bottom line defense. That's Connecticut against Heald. It's rejected an argument, similar argument, that the race of the manager matters. We need to keep our eye on what matters. We shall, Your Honor. Ultimately, Mr. Bio claims that less than five years earlier, Inventive hired him and promoted him, knowing he was black and from Niger, and that Inventive found positions for all of his team members with their diverse backgrounds and nationalities. There is no support in the record for his claim that there was any discriminatory animus against him. While the mini-RIF analysis really doesn't apply here, because of the district court's finding that there was no pretext, and the court can avoid that entire analysis, we turn to that because counsel made it as part of his claim here. I have no idea, by the way, what a mini-RIF is. It's yet more jargon in this case. The defense is that he was laid off because of lack of work. We don't have to call that a mini-RIF. Your Honor, we refer the court to this court's own decision. We agree that that analysis simply does not apply in this case. As the court held in the Griffin v. Sisters of St. Francis case in 2007, and in the Small v. Illinois Department of Public Health case in 2013. In essence, the analysis is where you have a unique position, and there is substantive work that remains, but that position is eliminated. The court says, we'll look at this, a different analysis. You don't have to show that comparator. However, that is all premised on the notion that the substantive work remains. Here, as in Griffin, as in Small, that substantive work did not remain. In Griffin, the court specifically found that the analysis did not apply when a plaintiff's job duties were not absorbed by other employees, when the employer discontinued the type of work the plaintiff performed. And even more directly on point is the Small case, where this court found that a manager's duties were not absorbed by others, even where her subordinates were retained and reassigned because the division where she worked was disbanded and the manager position was eliminated. That is precisely what occurred in this case. The work for which the team was designed and for which it was assigned went away. No one disputes that that specific work went away, and that work was not absorbed. The district court, without citing to any case of this court, simply said that it's reasonable to infer that newly assigned managers perform similar management tasks that BO had been performing as a manager. That's not the standard, and that couldn't be the standard. It simply says we have some general management duties that were taken on by others. There is no dispute in the record that this work went away. There is no dispute that that team no longer performed that work and that no other team performed that work. On that basis, the court's pretext analysis still applies, whether or not you apply the Griffin or Small cases, unless the court has further questions. I should note specifically the Zhang affidavit counsel referenced. Please read that carefully because Mr. Zhang only says that the work I was doing when Mr. BO's employment was terminated was the same work I was doing for Ms. Basile. That's not the issue. The issue is quite clearly he never says that I was doing the same work the team was designed to do on that heads-down programming work. So that work went away. That is beyond dispute. So the Zhang affidavit simply proves our point, which is that Mr. BO tried to freelance and take on projects for a variety of other teams and a variety of other managers, and that was not the work he was assigned to perform. Thank you. Thank you, counsel. Anything further, Mr. Stowers? Yes, briefly, Your Honor. Counsel said repeatedly that the work that Mr. BO was doing went away. He said there was no dispute in the record that that work went away. There is a dispute that that work went away. Mr. BO's work did not go away. Yu Zhang testified that he was doing the same work that he was doing for Mr. BO and that Asha Basile was doing the exact same work that Mr. BO was doing. Now, they refer to this heads-down programming. That's really just a disparaging way to refer to Mr. BO's work. He was doing more than numbers crunching. He was doing programming work just like the rest of the He and his team were doing programming work just like the rest of the programmers. And just to make certain for the court, when counsel says that the work that Mr. BO and his team was doing went away, that is simply not true, and the record will clearly state that the work that he was doing Yu Zhang clearly states that the work that he was doing under Mr. BO was the same work that he was doing under Asha Basile. And also, for the two programmers that worked under Mr. BO that were transferred to Steve Benjamin, those programmers were also still doing the exact same work that they were doing under Mr. BO, the advanced software testing. So it is simply not true that the work that Mr. BO was doing for Lilly had gone away. It still existed. Mr. BO and his team were still doing it. And additional projects from Eli Lilly was coming on board two weeks after Mr. BO was terminated. So again, we believe that the evidence will show there are genuine issues and material facts regarding the elements of the prima facie case and the issue of pretext. So we'd ask the court to reverse the decision made by the district court and remand the case for trial. Thank you. Thank you, counsel. The case is taken under advisement.